UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| PATRINA COULON., ) <br> ) <br>     Plaintiff, ) <br> ) <br>     v. ) <br> ) <br> ST. MARY PARISH SCHOOL BOARD, ) <br> DOES 1-10, ABC INSURANCE COMPANIES ) <br> ) <br> ) <br>     Defendants. ) <br> ) | Case No. 6:21-cv-00019 |

## **FIRST AMENDED COMPLAINT**

NOW INTO COURT, through undersigned counsel, comes Plaintiff, Patrina Coulon, who brings this suit against her former employer, St. Mary Parish School Board, alleging violations of Title VII of the Civil Rights Act and the Louisiana Constitution.

## **INTRODUCTION**

1. This is a case about how special education paraprofessional Plaintiff Patrina Coulon was forced to endure a pattern of sexual harassment and retaliation by her co-workers and supervisors.

2. In January, 2019, Ms. Coulon began working at Morgan City High School, a school within the St. Mary Parish Schools district, as a paraprofessional in the special education program.

3. Almost immediately, Ms. Coulon was subjected to sexual harassment by her co-workers, who used sexually explicit words and actions to mock her in front of the special-needs students, some of whom were harassed themselves.

1

4. Ms. Coulon, who is Black, tried to report the harassment and inappropriate behavior to her supervisor, who responded with a race-based threat, telling Ms. Coulon "white don't eat white and you'll be out the door."

5. The harassment continued and Ms. Coulon eventually reported it again. Unfortunately, her supervisor's threat came to fruition: Instead of punishing the harassers, Defendants transferred Ms. Coulon to another classroom and, soon thereafter, terminated her.

6. And at the same time, a rat trap was placed on Ms. Coulon's driveway – a clear signal of how she was perceived for reporting the sexual harassment.

7. Accordingly, Ms. Coulon brings this lawsuit.

## PARTIES

8. Plaintiff Patrina Coulon is of the full age of majority and is domiciled in St. Mary Parish, Louisiana. She brings this lawsuit to enforce her rights related to the harassment and retaliation experienced as an employee of St. Mary Parish School District and Morgan City High School.

9. Defendant St. Mary Parish School Board is, upon information and belief, the juridical entity which has administrative control over schools in the St. Mary Parish School District, including Morgan City High School. Upon information and belief, St. Mary Parish School District has twenty or more employees for each working day in each of twenty or more calendar weeks in any given year.

10. Doe Defendants 1-10 are individuals or entities not currently known to Plaintiff who may have participated in, allowed, or otherwise perpetuated the harassment and other claims alleged herein.

11. ABC Insurance Companies are insurance companies not currently known to Plaintiff who have issued and currently have in effect one of more policies of insurance covering one of more of the Defendants named herein.

## VENUE AND JURISDICTION

12. Venue is proper pursuant to 28 U.S.C. § 1391 in that Defendants are subject to personal jurisdiction in the Western District of Louisiana. The St. Mary Parish School Board maintains its principal place of business in the Western District of Louisiana, conducts business activities within the Western District of Louisiana, and a substantial part of the events giving rise to the claims occurred in the Western District of Louisiana.

13. This court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, in that Patrina Coulon's claims arise under the laws of the United States. Specifically, she brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. This court has supplemental jurisdiction over Ms. Coulon's claims arising from state law in accordance with 28 U.S.C. § 1367.

14. Ms. Coulon has exhausted all administrative remedies by filing a charge with the Equal Employment Opportunity Commission on December 30, 2019. The EEOC issued a right to sue letter on October 16, 2020.

## FACTUAL ALLEGATIONS

15. On January 11, 2019, Plaintiff Patrina Coulon started a new job as a paraprofessional at Morgan City High School ("Morgan High"), a school within the St. Mary Parish School district which is managed by the St. Mary Parish School Board ("Board").

16. Ms. Coulon was eager to begin her work assisting students in the special needs program with their daily activities, but was shocked when she became the target of harassment almost immediately.

17. On her first day of employment, Ms. Coulon's supervisor, Marilyn Guarisco, set the tone of what would to expect during introductions, telling Ms. Coulon that "We are not friends" and implying that she would not be receptive to any complaints or concerns should they arise on the job.

18. Soon thereafter, Ms. Coulon's co-workers subjected her to a pattern of pervasive and harmful sexual harassment, much of which occurred in the presence of special needs students or even targeted the children directly.

19. The harassers included a "clique" of employees including Ms. Guarisco, Shantell Kitchen (then Shantell Morse), Beverly Morris, Sabrina Gaspard, and others.

20. Initially, the sexualized language and suggestions took place primarily over text messages. For example:

**Fig. 1:** Text from Marilyn Guarisco.



> M Guarisco
>
> Shantell brought Trina some sexy lingerie. I'm trying to teach her how to give a good blows job. We practice on large pickles today! I was a born teacher!!!!!!

**Fig. 2:** Text from Shantell Morse. "Trina" was the nickname for Ms. Coulon.



**Fig. 3** Texts from Marilyn Guarisco, Sabrina Gaspard, and Ms. Pat



**Fig. 4**: Text from Marilyn Guarisco

> Went creeping about 9:30.....2orgasms later creeped back home. Happy bday to me!

**Fig. 5**: Text from Marilyn Guarisco

> M Guarisco
> Maybe if you bring your bathing suit and try it on for us....

**Fig. 6:** Texts from Marilyn Guarisco and Shantell Morse



6

21. The sexualized language via text message was offensive to Ms. Coulon and made her uncomfortable. So long as it was only by text message, however, it would have been somewhat manageable, and she participated in some non-sexualized conversations in an effort to fit in, a common response by harassment victims.

22. However, it was much harder for Ms. Coulon to endure sexualized discussions that occurred verbally in the classroom, often in front of the special-needs students.

23. These dramatically increased Ms. Coulon's level of discomfort.

24. It seemed that the members of the clique thought that the students were so impaired as to be completely insensate to their discussions.

25. On one occasion, several of Ms. Coulon's co-workers were openly discussing oral sex in the presence of students. They asked Ms. Coulon to weigh in on their conversation, but Ms. Coulon refused because it was not work-appropriate and none of their business no matter the environment.

26. Instead of changing the subject, Ms. Coulon's co-workers ridiculed her. One co-worker took the ridicule so far as to leave the building to buy a pickle before returning to the classroom and demonstrating to Ms. Coulon – and in front of the students – how to perform oral sex.

27. On another occasion, a co-worker used a banana to similarly mime sexual acts on top of a classroom desk and, again, in front of students. Specifically, Ms. Guarisco took a banana that had been left over from a student's lunch and pushed it into Beverly's genitals to mime sex acts.

28. Photos of Shantell Morse demonstrating sexual acts to Ms. Coulon in the classroom are seen below. Students (faces omitted by red bars) can be seen in the background watching Ms. Morse.





29. Ms. Coulon's co-workers became obsessed with her sex life, simply because she did not want to have explicit, sexual conversations at work.

30. Some other examples of sexual harassment directed at Ms. Coulon include:

    a. Comments about Ms. Coulon's breasts and nipples. For example, Ms. Coulon's co-workers would say "Why you shooting everyone?" when Ms. Coulon's nipples were erect.;

    b. Comments about other female co-workers' breasts. For example, Sgt. Stubbs would talk extensively about the size of Ms. Morse's breasts in front of Ms. Coulon.

    c. Making sexual implications about "sucking heads" while Ms. Coulon was eating crawfish;

      d.      Buying unwanted lingerie and other clothing for Ms. Coulon so she could "get sexy with" her husband;

      e.      Encouraging Ms. Coulon to get her private areas waxed;

      f.      Detailed discussions of the presumed penis sizes of various co-workers. For example, Shantell Morse and Sgt. Stubbs discussing his penis size and comparing it to the size of his hands;

      g.      Direct comments, such as calling Ms. Coulon a "bitch" to her face.

31. Ms. Coulon's co-workers appeared particularly fixated on whether Ms. Coulon was engaging in oral sex with her husband. Their comments repeatedly came back to this topic. (*E.g.*, "suckem girl," "never by pass honeymoon," suck "Until he is dry," practicing "good blows job" [sic].)

32. The comments about Ms. Coulon's nipples (*e.g.*, "Why you shooting everyone?") were particularly offensive because Ms. Coulon's nipples were reacting to a thyroid cancer medication she was on. To have students' and co-workers' attention drawn to the physical manifestation of her thyroid cancer treatment was humiliating.

33. Shantell Morse purchased an item of lingerie and presented it to Ms. Coulon in the classroom. See Fig. 3, *supra*.

34. Many of these comments and acts were done in the presence of the special education students which Ms. Coulon found to be especially inappropriate.

35. Ms. Coulon also observed harassment directed at the students in the special needs classroom. Ms. Coulon's co-workers would make jokes about the students and mock them, for instance by wrapping a student entirely in toilet paper while she was in the bathroom.

36. Another student hated to have her head covered with a blanket, so Ms. Coulon's co-workers would cover her with a blanket as a punishment.

37. One student was physically assaulted by a co-worker who twisted the student's arm and jerked him violently to the ground.

38. When Ms. Coulon complained about being called inappropriate names to Ms. Guarisco, her supervisor, she was told "You won't be here long cause this is my class."

39. Undeterred, Ms. Coulon reported the harassment to other supervisors, but none of the harassers received any punishment or reprimand.

40. In one such instance, Ms. Coulon was on her way to speak with the principal about the harassment. But before she could, she ran into the assistant principal, Kim Caesar, who told Ms. Coulon "white don't eat white and you'll be out the door," a shocking warning that Ms. Coulon, as a Black woman, should think twice before reporting her white co-workers.

41. The summer break brought some relief from harassment, but Ms. Coulon was dismayed upon returning for the Fall semester to learn that the sexual comments and activity would continue.

42. Ms. Coulon met with Principal Mickey Fabre in October, 2019, but instead of punishing her harassers Ms. Coulon was transferred to the science department.

43. But on December 5, 2019, Ms. Coulon was told that the science department had no need for a paraprofessional, so the school terminated her employment.

44. Two days after her termination, Ms. Coulon awoke to a rat trap in her driveway, which she understood as a message admonishing her for "ratting out" her co-workers.

45. Upon information and belief, Ms. Coulon's position in the special needs classroom has since been filled.

46. Months later, *after* filing an EEOC charge, Ms. Coulon accepted a new position as a bus driver for St. Mary Parish School District. In addition to being outside Ms. Coulon's preferred field of work, the new position is less desirable because it is significantly further from her home, requires longer and more inconvenient hours, has strained her ability to be available as a parent, carries an additional financial burden because she is not reimbursed for gas and other costs, and other factors.

47. At no point throughout Ms. Coulon's employment did she receive any negative performance evaluations, reviews, or other feedback that would explain why her employer transferred her to another department and then terminated her after reporting the harassment.

48. In May 2020, Principal Fabre stated at a St. Mary Parish School Board hearing that he did not believe that Ms. Coulon[1] should have been terminated and, further, that the district personnel director, acting on behalf of the Board and Superintendent Teresa Bagwell, instructed him to write-up another teacher on bogus facts in an effort to avoid legal liability.

49. In short, Ms. Coulon endured sexual and race-based harassment from her co-workers, but Defendants retaliated against Ms. Coulon by transferring her and then terminating her instead of addressing the problem. Meanwhile, her harassers are still employed in the special needs classroom.

50. As a result. Ms. Coulon suffered a loss of wages, as well as damages related to the emotional toll of enduring discrimination.

51. On December 18, 2019, Ms. Coulon filed a charge with the Equal Employment Opportunity Commission.

52. On October 16, 2020, the EEOC issued Ms. Coulon a Right to Sue letter.

---

[1] Although Mr. Fabre did not state a name at the hearing, upon information and belief he was referring to Ms. Coulon.

## CLAIMS FOR RELIEF

*Each claim alleged against every Defendant*

### *Count One – Sexual Discrimination in Violation of Title VII of the Civil Rights Act*

53. Plaintiff realleges and incorporates each and every foregoing paragraph.

54. Title VII of the Civil Rights Act prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

55. Sexual harassment is a form of discrimination based on sex under Title VII. *See, e.g. Lemaire v. Louisiana Dept. of Transp.*, 480 F.3d 383, 387 (5th Cir. 2007).

56. A plaintiff can prove discrimination under Title VII with either circumstantial or direct evidence. *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir.2003).

57. Here, Ms. Coulon has alleged direct evidence of discrimination, namely the harassment perpetuated by various supervisors acting on behalf of Defendants.

58. Ms. Coulon has also alleged a *prima facie* case of circumstantial discrimination because she is a member of a protected class, was qualified for her position, and suffered an adverse employment action while other similarly situated employees were treated more favorably because they were not the victims of harassment. *Rutherford v. Harris County Texas*, 197 F.3d 173, 184 (5th Cir. 1999).

### *Count Two – Racial Discrimination in Violation of Title VII of the Civil Rights Act*

59. Plaintiff realleges and incorporates each and every foregoing paragraph.

60. Title VII of the Civil Rights Act prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

61. Here, Defendants directly discriminated against Plaintiff when she reported the harassment but was told "White don't eat white and you'll be out the door," as well as other alleged conduct.

62. Ms. Coulon has also alleged a *prima facie* case of circumstantial discrimination because she is Black, was qualified for her position, and suffered an adverse employment action while other similarly situated employees were treated more favorably because they were not Black. *Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009).

### *Count Three* – **Retaliation in Violation of Title VII of the Civil Rights Act**

63. Plaintiff realleges and incorporates each and every foregoing paragraph.

64. Title VII of the Civil Rights Act also protects employees who suffer an adverse employment action because they engaged in a protected activity. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999)

65. Many activities are considered "protected" under Title VII, including but not limited to reporting or opposing harassment. *Carter v. Town of Benton*, 827 F.Supp.2d 700 (W.D. La. 2010).

66. Here, Ms. Coulon reported harassment to Defendants, who responded by transferring her to another department and then terminating her employment.

67. Ms. Coulon reasonably believed that the practices she complained of were unlawful.

68. Ms. Coulon's transfer and termination would not have occurred but for her reporting the harassment, as it occurred directly in response to her reporting.

69. That Defendants ordered Mr. Fabre to fabricate reasons to write-up an employee to avoid legal liability suggests that Defendants did not act in good faith when they transferred and terminated Ms. Coulon.

*Count Four* – **Perpetuation of a Hostile Work Environment in Violation of Title VII of the Civil Rights Act**

70. Plaintiff realleges and incorporates each and every foregoing paragraph.

71. Under Title VII, a plaintiff may have a claim for a hostile work environment if she belongs to a protected group, was subjected to sexual harassment that affected a term, condition, or privilege of her employment, and the employer knew or should have known about the harassment and did not adequately address it. *Royal v. CCC&R Tres Arboles, L.L.C.*, 736 F.3d 396, 401 (5th Cir. 2013).

72. Here, Ms. Coulon was the subject of unwanted sexual harassment over a period of months and the harassment continued until she was transferred and then terminated.

73. The harassment was allowed to continue, despite Ms. Coulon appealing to her supervisors, one of which actually participated in the harassment and threatened her not to continue reporting said harassment.

74. Ms. Coulon also witnessed harassment of students, which she reported. But the harassers were not reprimanded and, upon information and belief, are still working with those students.

75. The hostile work environment was pervasive and ongoing and Ms. Coulon's efforts to mitigate the harassment only made her the subject of further harassment.

76. The harassment even continued post-termination, as Ms. Coulon's co-workers are believed to have left a rat trap on her driveway as a warning.

*Count Five* – **Violation of Louisiana Employment Discrimination Law (La. R.S. 23:3021, *et seq.*)**

77. Plaintiff realleges and incorporates each and every foregoing paragraph.

78. Louisiana law makes it illegal for an employer to "[i]ntentionally fail or refuse to hire or to discharge any individual, or otherwise to intentionally discriminate against any individual with respect to his compensation, or his terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." La. R.S. 23:332.

79. The Louisiana anti-discrimination law shares a similar scope and applicability to its federal counterparts plead herein. *White v. Golden*, 982 So.2d 234, 243 (La. App. 2008).

80. For the reasons stated above, Defendants discriminated against Ms. Coulon based on both her gender and race in violation of Louisiana law.

*Count Six* – **Breach of Implied Covenant of Good Faith and Fair Dealing**

81. Plaintiff realleges and incorporates each and every foregoing paragraph.

82. Every contract in Louisiana carried an implied covenant of good faith and fair dealing. *Grisaffi v. Dillard Dep't Stores, Inc.*, 43 F.3d 982, 983 (5th Cir.1995).

83. Defendants failed to act in good faith and fair dealing with regards to Ms. Coulon's employment contract when they transferred her and then terminated her based on a lack of need in the department to which they transferred her.

*Count Seven* – **Breach of Louisiana's Whistleblower Protection Law**

84. Louisiana law prohibits "reprisal" against any employee who "discloses or threatens to disclose a workplace act or practice that is in violation of state law" after "advising the employer of the violation of law." R.S. 23:967.

85. Public employees like Ms. Coulon have additional protections under R.S. 42:1169, which promises that an employee who is punished for reporting even rule violations is "entitled to reinstatement of his employment and entitled to receive any lost income and benefits for the period of any suspension, demotion, or dismissal."

86. Here, Ms. Coulon disclosed workplace acts and practices that violated the Louisiana Employment Discrimination Law, state law of battery, and other state laws covering the treatment of students.

87. Ms. Coulon was subject to reprisal and punishment for reporting those violations of law.

## RELIEF REQUESTED

88. Wherefore Plaintiff requests judgment to be entered against Defendants and that the Court grant the following:

    a. Declaratory relief;

    b. Judgment against Defendants for Plaintiff's asserted causes of action;

    c. Award of compensatory damages;

    d. Award of special damages;

    e. Award costs and attorney's fees;

    f. Order such other and further relief at law or in equity to which Plaintiff may be justly entitled.

Respectfully submitted,

PATRINA COULON, by and through their counsel,

/s/ David Lanser
David Lanser (La. Bar No. 37764)
William Most (La. Bar No. 36914)
Law Office of William Most
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
T: (504) 509-5023
Email: david.lanser@gmail.com