**UNITED STATES DISTRICT COURT**
**WESTERN  DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | | |
|---|---|---|
| Patrina Coulon | * | Civil Action No. 6:21-CV-00019 |
| *Plaintiff* | * | |
| | * | |
| vs. | * | Judge James D. Cain, Jr. |
| | * | |
| St. Mary Parish School Board, Teresa | * | |
| Bagwell, Does 1-10, ABC Insurance Companies | * | Magistrate Patrick J. Hanna |
| *Defendants* | * | |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**NOW INTO COURT**, through undersigned counsel, come defendant, St. Mary Parish School

Board ("School Board"), in the above-styled cause, and in support of the contemporaneously filed

Motion for Summary Judgment, submits this Statement of Undisputed Material Facts as follows:

1.  Plaintiff applied for and was hired as a day by day substitute with the School Board on or about August 20, 2018.

2.  Alicia Morris, Administrative Assistant/Clerk Ainformed Ms. Coulon of the temporary nature of substitute positions, both day-to-day and long-term, as was her ordinary practice with all newly hired substitutes.

3.  Day-to-day substitutes may be placed in long-term substitute positions when a need is identified by school principals.

4.  Principals must obtain approval from Ms. Debra McClarity, Director of Special Education, with respect to long-term substitute paraprofessional substitute positions.

5.  If Ms. McClarity determines it is necessary,  she determines who is placed in the position.  Ms. McClarity will consider recommendations from principals if they have such a recommendation.

6.  Day-to-day substitutes may also become long-term substitutes automatically if they are working in the same position for over 21 consecutive school days.

7.  Any time a day-to-day substitute is converted to a long-term substitute, their name is removed from the list that principals use on a day-to-day basis as short-term needs arise.

8.  For the long-term substitute, they will continue in that role and at that location until the need for a long-term substitute is over.

9.      It is Ms. McClarity's responsibility to determine how many special educations paraprofessionals are needed at each school at any give time based on the number of special education students and level of need.  Paraprofessionals are paid through funds specifically designated for students with disabilities by the federal government, and Ms. McClarity  must be able to show justification for expenditures of those federal funds.  As such, it is very important that the number of allotments determined for any given school not be exceeded without justification.

10.     Depending on needs of students and available full-time employee paraprofessionals, it is Ms. McClarity's responsibility to determine how many substitute paraprofessionals are needed and how many full-time, permanently hired paraprofessionals are needed at each individual school-site.

11.     All substitute paraprofessionals are hired as day-to-day substitutes, and some are placed in positions as long-term substitute paraprofessionals for various reasons.  For example, a long-term substitute may be placed in a classroom to substitute for a permanent paraprofessional who is out on leave.  Or a substitute could be placed into a vacant position until an individual with the required certification is hired.

12.     Long-term substitute positions are not for any specified period and are subject to end at any time, lasting until the individual whose position was being covered returns, or until an individual with the necessary qualifications/certifications is hired for positions that are vacant.  If neither of these things happen during the school-year, the long-term position ends upon the last day of that year.

13.     Once the long-term position has ended, the individual is automatically moved back to the day-to-day substitute list such that they may be called out for short-term needs.

14.     In January of 2018, a Licensed Professional Nurse (LPN) Paraprofessional retired from her position at Morgan City High School, and Ms. Coulon was assigned as a long-term substitute in that position as they searched for another LPN Paraprofessional for the permanent position, where Ms. Coulon remained throughout the remainder of the 2018-2019 school-year (Spring 2019 semester).

15.     There is one self-contained classroom at Morgan City High School, taught by Ms. Marilyn Guarisco.  This class has students with significant disabilities, some with medical needs.  A self-contained setting is one where the students remain in that class for the entirety of the school-day due to having significant cognitive and/or physical needs.   The students learn a modified curriculum based upon their specific needs as determined by their Individual Education Plan (IEP).

16.     There is also a combined setting at Morgan City High School, taught by Ms. Sabrina Gaspard. These students are higher functioning than those that are in Ms. Guarisco's classroom but still have significant needs.  The students in Ms. Gaspard's class attend part of the day in a self-contained classroom and one to two periods per day in the special education resource classroom.

17.     Ms. Coulon was shared between Ms. Guarisco and Ms. Gaspard.

18.     The students in the resource classroom are learning a traditional High School curriculum with modifications and accommodations per an Individual Education Program (IEP) developed for each student.  The content of the resource classroom is much more rigorous than in the self-contained classroom due to higher levels of student functioning.

19.     The resource special education classroom has the most high-functioning students, and all students receive some services in regular education classrooms.

20.     The School Board has one paraprofessional assigned to resource, Ms. Beverly Morris, who provides services to students both in the special education resource classroom and to students as they attend regular classes, pursuant to their IEPs.  Ms. Morris is a full-time employee with the proper certifications and experience to provide the type of assistance being provided to these students.

21.     During the 2018-2019 and 2019-2020 school years, Ms. McClarity allotted three (3) paraprofessionals to Morgan City High School, with one (1) assigned to the self-contained classroom all day (Ms. Kinchen), one assigned primarily to Ms. Gaspard's classroom and who would provide some assistance to Ms Guarisco throughout the day (Ms. Coulon), and the third to work with the more high-functioning students (Ms. Morris).

22.     Throughout that time period, the Office of Special Education was seeking to hire two (2) Licensed Professional Nurses (LPN) paraprofessionals for Ms. Guarisco's and Ms. Gaspard's classrooms.

23.     Ms. Coulon served as a long-term substitute paraprofessional at Morgan City High School during the Spring semester of the 2018-2019 school year, and for a portion of the Fall semester during the 2019-2020 school year, assigned primarily to Ms. Gaspard's classroom and to provide assistance to Ms. Guarisco's students, until an LPN could be hired.

24.     During the Spring semester of 2019, Ms. Coulon got along well with her co-workers and they quickly became friends.

25.     Ms. Coulon voluntarily participated in text messages with the group, some of which were colorful.

26.     As an LPN had not yet been hired for the Fall of 2019, Mr. Fabre recommended that she return because she meshed so well with her colleagues, and Ms. McClarity approved.

27.     Numerous witnesses testified that Ms. Coulon and her co-workers were more than mere colleagues, but that they were friends.

28.     Ms. Coulon testified to engaging in group activities with her co-workers in the manner that friends do - going to the movies, out to dinner, exercising together, engaging in numerous text communications with the group, sending pictures of herself in various outfits or with a new hair

style, sending pictures of herself in Jamaica, sending pictures of eating crawfish and engaging in jokes regarding sucking the heads, and accepting (and later showing off) outfits given to her by one of the alleged harassers, Shantel Kinchen (who also happened to be he cousin).

29.    Ms. Coulon had a history of accepting clothing from Shantel Kinchen that Shantel no longer needed.  One lingerie item was given to her by Ms. Kinchen, which Ms. Coulon accepted.

30.    Plaintiff did not file a complaint of harassment until *after* a disciplinary conference was held to address Ms. Coulon's altercation with one of the special education teachers, Ms. Sabrina Gaspard, that occurred on October 23, 2019.

31.    After being asked to return as a special education paraprofessional in the Fall because she had done well the year prior, things quickly deteriorated.  Ms. Coulon's support in Ms. Gaspard's class became sporadic, starting with her having to take off of work for various doctor's appointments or other matters.  Then, when she was at school, she would avoid coming to Ms. Gaspard's classroom, preferring to stay in Ms. Guarisco's classroom, despite that fact that she was supposed to provide services in Ms. Gaspard's classroom in accordance with a schedule.

32.    It became a hardship for Ms. Gaspard as the students in her class were not getting the support that they needed, culminating in a verbal altercation between Ms. Gaspard and Ms. Coulon on October 23, 2019.

33.    On that day, in front of students, Ms. Coulon yelled at Ms. Gaspard and stated that she did not want to work with Ms. Gaspard or with those "types of kids."  The students were visibly upset and Ms. Gaspard asked Ms. Coulon to leave her room.

34.    Ms. Gaspard was admittedly angry, and after the incident, both parties were asked to write a statement for review by the school-site administrator and were issued a written reprimand.

35.    Ms. Coulon's statement described various complaints about working with the involved teacher but made no mention whatsoever of sexual harassment.

36.    A disciplinary conference was held with both parties, and Ms. Coulon was warned about the importance of maintaining professionalism, going to assigned classes at assigned times, and improper utilization of her cell-phone during instructional time.  The involved teacher was also issued a similar disciplinary conference form.

37.    Ms Cook informed Mr. Fabre at that meeting that she did not want to go back into the special education classroom.

38.    Mr. Fabre contacted Ms. McClarity so they could determine how staffing would need to be rearranged.

39.    It was not until that date, October 28, 2019,  that Ms. Coulon brought a complaint of sexual harassment.

40.     In her Complaint to the Court, Plaintiff attributes this delay to being allegedly told by the Assistant Principal, Kim Caesar, that "white don't eat white and you'll be out the door" as she was purportedly headed to report the harassment to Mr. Fabre.  However, when asked about this during her deposition, Ms. Coulon testified that this conversation would have happened on *the same day* that Ms. McClarity came to discuss the altercation - October 28, 2019 - *after* she had been issued a written reprimand and *after* she had advised she did not want to remain in the special education classroom.  Therefore, even if such a conversation occurred (which is at all times denied), it could not have delayed her reporting as she earlier alleged.

41.     Plaintiff submitted a number of colorful text messages and photographs in support of her allegation, further making claims about alleged poor treatment of special educations students.

42.     Plaintiff's allegations were fully investigated.

43.     As part the investigation Ms. Coulon submitted a set of text messages as purported evidence of the alleged harassment; however, during the investigation admitted that she had deleted all of her comments from the message threads before sharing with the school administrator.

44.     Based on the interviews with witnesses it was clear to administration that Ms. Coulon's allegations were without merit.  The involved individuals, including Ms. Coulon, were all friends and Ms. Coulon was a willing participant in all conversations - whether of a sexual nature or otherwise.

45.     It was not until Ms. Coulon had her falling out with Ms. Gaspard and was issued a disciplinary conference report with respect to *her own* poor behavior that these allegations of harassment arose.  Furthermore, most, if not all, of the personal conversations occurred away from school, outside of school hours, and on the personal devices of all parties.

46.     Ms. Coulon requested that she not be placed back into the special education classroom, so it was up the school and Ms. McClarity to determine how staffing should be arranged.

47.     At about that same time, Ms. McClarity had to undergo emergency surgery, and the matter was placed on hold until she was well enough to return.  In the interim, because Morgan City High School was allotted three (3) paraprofessionals, Mr. Fabre was able to retain Ms. Coulon at the school.

48.     In late November or early December two LPN paraprofessionals were hired and the plan was to place them both at Morgan City High School.  Ms. McClarity was still out on leave, so Ms. Bergeron went to the school to notify both Ms. Kinchen and Ms. Coulon that their services at Morgan City High School were coming to an end.

49.     As a full-time permanent employee, Ms. Kinchen was notified that she would be transferred to another school.

50.     There was no need for any additional long-term substitute paraprofessionals in the district at the time, so Ms. Coulon was placed back on a day-by-day substitute status.

51.     Ms. Coulon was not fired or terminated from her employment and remained on the substitute list.

52.     According to Ms. Coulon the harassment began in January of 2019, when she had first been placed as a long-term substitute at Morgan City High School.

52.     After her position ended at the end of that school-year, she continued to communicate with the group throughout the Summer.

53.     Subsequently, Plaintiff readily accepted the opportunity to return as a long-term substitute paraprofessional in the Fall of 2019 to be assigned to those same classrooms.

54.     At the end of the 2018-2019 school-year, May 27, 2019, Ms. Coulon sent a text message stating "[t]hanks for having me in your class this school year and looking forward to seeing you next school year," with three different heart emojies.

55.     In response, Ms. Guarisco referred to Ms. Coulon, Ms. Kinchen, and herself as the "Three Musketeers."

56.     After continued communication over the Summer and agreeing to go back to the long-term substitute position, on September 24, 2019, approximately *one month before* Ms. Coulon made her allegation of sexual harassment, she sent a text message Ms. Kinchen stating "[y]ou and Gee [Ms. Guarisco] are the best.  I couldn't ask God to place me in a better working place."

**Respectfully submitted,** this the 14ᵗʰ day of April, 2022

**HAMMONDS, SILLS, ADKINS & GUICE, LLP**
2431 S. Acadian Thruway, Suite 600
Baton Rouge, Louisiana   70808
Telephone:      225/923-3462
Facsimile:       225/923-0315

 *s/ Melissa S. Losch*
**ROBERT L. HAMMONDS**
Louisiana Bar Roll No. 6484
**PAMELA WESCOVICH DILL**
Louisiana Bar Roll No. 31703
**MELISSA S. LOSCH, T.A.**
Louisiana Bar Roll No. 26811
**JOHN R. BLANCHARD**
Louisiana Bar Roll No. 37036

## CERTIFICATE OF SERVICE

I do hereby certify that, on the date stated below, a true and correct copy of the above and foregoing **STATEMENT OF UNDISPUTED FACTS** was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Plaintiffs of record by operation of the court's electronic filing system.

**BATON ROUGE, LOUISIANA,** this 14th day of April, 2022

 _s/Melissa S. Losch_
MELISSA S. LOSCH